**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**

CVS HEALTH CORPORATION, AETNA HEALTH OF CALIFORNIA INC., AETNA HEALTH OF OHIO INC., AETNA HEALTH INC. (GA), COVENTRY HEALTH CARE OF ILLINOIS, INC., COVENTRY HEALTH AND LIFE INSURANCE COMPANY, AETNA HEALTH INC. (FL), COVENTRY HEALTH CARE OF WEST VIRGINIA, INC., AETNA BETTER HEALTH OF MICHIGAN INC., SILVERSCRIPT INSURANCE COMPANY, COVENTRY HEALTH CARE OF MISSOURI, INC., AETNA BETTER HEALTH INC. (GA), AETNA HEALTH INC. (NJ), AETNA HEALTH OF MICHIGAN INC., ALLINA HEALTH AND AETNA INSURANCE COMPANY, AETNA BETTER HEALTH, INC. (LA), AETNA HEALTH AND LIFE INSURANCE COMPANY, AETNA HEALTH INC. (NY), AETNA HEALTH INC. (ME), AETNA BETTER HEALTH OF WASHINGTON, INC., AETNA HEALTH INC. (LA), AETNA HEALTH INC. (PA), AETNA HEALTH INC. (TX), COVENTRY HEALTH CARE OF NEBRASKA, INC., AETNA BETTER HEALTH OF OKLAHOMA INC., AETNA BETTER HEALTH OF CALIFORNIA INC., AETNA HEALTH INC. (GA), COVENTRY HEALTH CARE OF KANSAS, INC., AETNA LIFE INSURANCE COMPANY, AETNA HEALTH OF IOWA INC., AETNA HEALTH INC. (CT), AETNA BETTER HEALTH INC. (CT), AETNA BETTER HEALTH INC. (NJ), AETNA BETTER HEALTH OF TEXAS INC., AETNA HEALTH OF UTAH INC., AETNA BETTER HEALTH OF MICHIGAN INC., FIRST HEALTH LIFE & HEALTH INSURANCE COMPANY, AETNA BETTER HEALTH PREMIER PLAN MMAI INC.,

Plaintiffs,

Civil Action No. [__]

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244

Defendants.

**COMPLAINT**

Plaintiffs CVS Health Corporation and its subsidiaries, Aetna Health of California Inc., Aetna Health of Ohio Inc., Aetna Health Inc. (GA), Coventry Health Care of Illinois, Inc., Coventry Health and Life Insurance Company, Aetna Health Inc. (FL), Coventry Health Care of West Virginia, Inc., Aetna Better Health of Michigan Inc., SilverScript Insurance Company, Coventry Health Care of Missouri, Inc., Aetna Better Health Inc. (GA), Aetna Health Inc. (NJ), Aetna Health of Michigan Inc., Allina Health and Aetna Insurance Company, Aetna Better Health, Inc. (LA), Aetna Health and Life Insurance Company, Aetna Health Inc. (NY), Aetna Health Inc. (ME), Aetna Better Health of Washington, Inc., Aetna Health Inc. (LA), Aetna Health Inc. (PA), Aetna Health Inc. (TX), Coventry Health Care of Nebraska, Inc., Aetna Better Health of Oklahoma Inc., Aetna Better Health of California Inc., Aetna Health Inc. (GA), Coventry Health Care of Kansas, Inc., Aetna Life Insurance Company, Aetna Health of Iowa Inc., Aetna Health Inc. (CT), Aetna Better Health Inc. (CT), Aetna Better Health Inc. (NJ), Aetna Better Health of Texas Inc., Aetna Health of Utah Inc., Aetna Better Health of Michigan Inc., First Health Life & Health Insurance Company, and Aetna Better Health Premier Plan MMAI Inc. (collectively, "CVS

Health"), by and through their undersigned counsel, bring this Complaint seeking relief against Defendants the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (together, "Defendants").

In support of this Complaint, CVS Health alleges as follows:

## INTRODUCTION

1. CVS Health brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., seeking to vacate CMS's 2027 Star Ratings for the contracts identified in Exhibit A to this Complaint. Those ratings were calculated using 28 measures that were unlawfully adopted and should be removed from consideration.

2. This Complaint does not ask the Court to break new ground; that is because this Court already considered and disposed of identical legal arguments in *Clover Insurance Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026). In *Clover*, this Court held that 20 measures that factored into the calculation of the plaintiff's 2026 Star Ratings were improper because CMS exceeded its statutory authority under 42 U.S.C. § 1395w-23(o)(4)(A) and failed to undertake the requisite public notice-and-comment rulemaking required by 42 U.S.C. § 1395hh(a)(2).

3. With one exception not relevant here, CMS proceeded to incorporate the same measures into its calculation of the 2027 Star Ratings despite this Court's decision in *Clover*, and despite having effectuated the *Clover* judgment by recalculating the 2026 Star Rating for the plaintiff in that matter.[1] Moreover, even though this Court's *Clover* decision was expressly limited to Clover's 2026 Star Ratings, CMS voluntarily excluded the equivalent measures struck down in

[1] One of the measures the *Clover* court held unlawful—MTM Program Completion Rate for CMR, which was known by the alphanumeric "D11" for 2026 Star Ratings purposes—was subject to a planned removal for purposes of the 2027 Star Ratings, so is not at issue here.

that case when calculating Clover's current 2027 Star Ratings. And yet, *no other* affected Medicare Advantage plan received the same treatment.

4. For the reasons articulated by the Court in *Clover*, and the additional reasons identified in this Complaint, CVS Health seeks an order directing CMS to recalculate its 2027 Star Ratings excluding the 28 measures challenged in this Complaint.

5. Through its Star Ratings program, CMS annually evaluates the quality of Medicare Advantage ("MA") health insurance coverage offered through its contracts with MA organizations ("MAOs") and assigns each contract a rating on a 1-to-5-star scale—a metric intended to signal coverage quality to beneficiaries. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii). These ratings carry substantial reputational and financial importance to MAOs, making the program a cornerstone of MA for plans and members.

6. To calculate each contract's Star Rating, CMS evaluates every MA contract against a uniform set of "measures" using a consistent methodology covering quality, compliance, and related metrics. The resulting ratings serve a dual purpose: they both signal coverage quality to beneficiaries and directly determine funding CMS remits to MAOs—through rebate retentions and Quality Bonus Payments ("QBPs")—in the year following the rating year (*i.e.*, the payments lag the rating year by one year). On October 8, 2026, CMS released the "2027 Star Ratings"; those ratings in turn will dictate CVS Health's 2028 rebate retentions and QBPs.

7. QBPs and rebate retention dollars directly fund MAOs' ability to expand member benefits, lower premiums, and invest in quality improvement, ultimately shaping the competitiveness and value of the MA products available to beneficiaries.

8. Through the filing of this action, CVS Health seeks to vacate the 2027 Star Ratings received for Contracts H0523, H0628, H1109, H1206, H1608, H1609, H1692, H2056, H2293,

H2663, H3146, H3152, H3192, H3219, H3239, H3288, H3312, H3597, H3748, H3928, H3931, H3959, H4523, H4711, H4835, H4982, H5302, H5325, H5521, H5522, H5593, H5793, H6303, H6399, H7149, H7301, H8597, H8649, H9314, H9431, H9771, R6694, and S5601 on the ground that CMS incorporated into those ratings 28 measures that exceed CMS's statutory authority, were adopted without the notice-and-comment rulemaking required by law, or both. Had CMS calculated the 2027 Star Ratings without regard to those 28 unlawful measures, CVS Health would realize across the contracts at issue in this Complaint, directly or indirectly, a more than $2 billion increase in its 2028 QBP and rebate retention. These are funds that CVS Health could apply toward expanding member benefits, reducing premiums, and investing in quality improvement.

9. The harm to CVS Health is not exclusively financial; lower ratings carry meaningful reputational harm, which can in turn impact membership. CMS publishes Star Ratings through its Plan Finder tool, directly influencing beneficiary enrollment and other consumer decisions, and contracts rated 4.0 stars or above can offer enhanced benefits funded by higher QBPs, thereby shaping competitive positioning in the MA marketplace. By incorporating unlawful measures into the 2027 Star Ratings calculation, CMS cast CVS Health's ratings in a poorer light in the eyes of Medicare Advantage consumers relative to peer MAOs, undermining CVS Health's ability to compete for Medicare beneficiaries through enhanced benefits and the like.

10. Through this action, CVS Health seeks an order vacating its 2027 Star Ratings and directing CMS to recalculate those ratings excluding the 28 challenged measures.

## JURISDICTION, VENUE, AND EXHAUSTION

11. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq*.

12. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies and a substantial part of the events or omissions giving rise to the claims occurred within this District.

13. Of all contracts held by CVS Health that were negatively impacted by CMS's use of the 28 unlawful measures in calculating the 2027 Star Ratings, Contract H3959 sustained the greatest financial harm, with an estimated loss of $361,068,250 attributable to the inclusion of those measures. Various contracts have plan members residing in the Southern District of Georgia, including: Contract H3959 (3 members), Contract H0628 (1 member), Contract H1109 (9 members), Contract H1608 (96 members), Contract H1609 (1 member), Contract H2293 (13,007 members), Contract H3288 (3,941 members), Contract H5302 (3,809 members), Contract H5521 (11 members), Contract H5522 (2,318 members), Contract H5793 (1 member), and Contract H6399 (1 member).

14. On October 8, 2026, CMS published CVS Health's 2027 Star Ratings, which constitutes final agency action. The ratings were disseminated to, among others, the over 23,000 members residing within this District.

15. No administrative process exists through which CVS Health may seek reconsideration of CMS's actions challenged by this Complaint.

16. CVS Health has standing because it offers plans whose 2027 Star Ratings were calculated using 28 measures that exceeded CMS's statutory authority or were adopted without regard to procedures required by law. Those unlawful measures impacted CVS Health's ratings, inflicting substantial economic harm and placing CVS Health at a competitive disadvantage in the MA marketplace.

17. CVS Health's improperly calculated Star Ratings will inflict substantial economic

harm on CVS Health, amounting to more than $2 billion in lost QBP and rebate retention over the course of 2028.

## PARTIES

18. CVS Health is a Pennsylvania corporation maintaining its principal place of business in Hartford, Connecticut.

19. CVS Health, one of the nation's leading health insurers, offers health and dental benefit products through its affiliates and subsidiaries. Pursuant to those affiliates' and subsidiaries' contracts with CMS, CVS Health furnishes coverage to Medicare beneficiaries under Parts C and D, including through the following contracts covering approximately 7,033,760 individual beneficiaries:

a. Contract H0523, entered into with CMS by Aetna Health of California Inc., serves its 11,252 members in California. CVS Health is the designated parent corporation under the MA program for this contract. Contract H0523 received a 2027 Star Rating of 3.

b. Contract H0628, entered into with CMS by Aetna Health of Ohio Inc., serves its 132,259 members in Ohio, Kentucky, and Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H0628 received a 2027 Star Rating of 3.5.

c. Contract H1109, entered into with CMS by Aetna Health Inc. (GA), serves its 1,721 members in Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H1109 received a 2027 Star Rating of 4.

d. Contract H1206, entered into with CMS by Coventry Health Care of Illinois, Inc., serves its 4,349 members in Illinois and Wisconsin. CVS Health is the designated parent corporation under the MA program for this contract. Contract H1206 received a 2027 Star Rating

of 3.5.

e. Contract H1608, entered into with CMS by Coventry Health and Life Insurance Company, serves its 118,257 members in Iowa, Missouri, Kansas, West Virginia, Arkansas, Ohio, South Dakota, Nebraska, North Dakota, Georgia, and Illinois. CVS Health is the designated parent corporation under the MA program for this contract. Contract H1608 received a 2027 Star Rating of 4.

f. Contract H1609, entered into with CMS by Aetna Health Inc. (FL), serves its 120,757 members in Florida, Iowa, and Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H1609 received a 2027 Star Rating of 4.

g. Contract H1692, entered into with CMS by Coventry Health Care of West Virginia, Inc., serves its 21,686 members in West Virginia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H1692 received a 2027 Star Rating of 3.5.

h. Contract H2056, entered into with CMS by Aetna Better Health of Michigan Inc., serves its 8,080 members in Oregon. CVS Health is the designated parent corporation under the MA program for this contract. Contract H2056 received a 2027 Star Rating of 3.

i. Contract H2293, entered into with CMS by Silverscript Insurance Company, serves its 115,596 members in Georgia and Texas. CVS Health is the designated parent corporation under the MA program for this contract. Contract H2293 received a 2027 Star Rating of 3.5.

j. Contract H2663, entered into with CMS by Coventry Health Care of Missouri, Inc., serves its 114,846 members in Missouri, Kansas, Illinois, Arkansas, and Oklahoma. CVS Health is the designated parent corporation under the MA program for this contract. Contract H2663 received a 2027 Star Rating of 3.5.

k. Contract H3146, entered into with CMS by Aetna Better Health Inc. (GA), serves

its 57,558 members in North Carolina, South Carolina, and Tennessee. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3146 received a 2027 Star Rating of 3.5.

l. Contract H3152, entered into with CMS by Aetna Health Inc. (NJ), serves its 30,305 members in New Jersey. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3152 received a 2027 Star Rating of 4.

m. Contract H3192, entered into with CMS by Aetna Health of Michigan Inc., serves its 28,461 members in Michigan, Illinois, and Indiana. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3192 received a 2027 Star Rating of 3.5.

n. Contract H3219, entered into with CMS by Allina Health and Aetna Insurance Company, serves its 56,682 members in Minnesota. Allina Health and Aetna Insurance Holding Company is the designated parent corporation under the MA program for this contract. Contract H3219 received a 2027 Star Rating of 3.5.

o. Contract H3239, entered into with CMS by Aetna Better Health, Inc. (LA), serves its 53,603 members in Alabama, Louisiana, and Mississippi. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3239 received a 2027 Star Rating of 3.5.

p. Contract H3288, entered into with CMS by Aetna Health and Life Insurance Company, serves its 67,937 members in Texas, Georgia, and Oklahoma. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3288 received a 2027 Star Rating of 3.5.

q. Contract H3312, entered into with CMS by Aetna Health Inc. (NY), serves its

104,586 members in New York. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3312 received a 2027 Star Rating of 3.

r. Contract H3597, entered into with CMS by Aetna Health Inc. (ME), serves its 22,303 members in Maine. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3597 received a 2027 Star Rating of 4.

s. Contract H3748, entered into with CMS by Aetna Better Health of Washington, Inc., serves its 4,394 members in Washington. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3748 received a 2027 Star Rating of 3.5.

t. Contract H3928, entered into with CMS by Aetna Health Inc. (LA), serves its 4,917 members in Louisiana. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3928 received a 2027 Star Rating of 3.5.

u. Contract H3931, entered into with CMS by Aetna Health Inc. (PA), serves its 71,498 members in Virginia, Nevada, Arizona, Colorado, Washington, Pennsylvania, Ohio, Delaware, the District of Columbia, North Carolina, and Maryland. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3931 received a 2027 Star Rating of 3.5.

v. Contract H3959, entered into with CMS by Aetna Health Inc. (PA), serves its 206,058 members in Pennsylvania, Delaware, and Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H3959 received a 2027 Star Rating of 3.5.

w. Contract H4523, entered into with CMS by Aetna Health Inc. (TX), serves its 38,297 members in Texas. CVS Health is the designated parent corporation under the MA program for this contract. Contract H4523 received a 2027 Star Rating of 3.

x. Contract H4711, entered into with CMS by Coventry Health Care of Nebraska, Inc., serves its 8,401 members in Nevada and Colorado. CVS Health is the designated parent corporation under the MA program for this contract. Contract H4711 received a 2027 Star Rating of 3.

y. Contract H4835, entered into with CMS by Aetna Better Health of Oklahoma Inc., serves its 3,641 members in Arizona. CVS Health is the designated parent corporation under the MA program for this contract. Contract H4835 received a 2027 Star Rating of 3.

z. Contract H4982, entered into with CMS by Aetna Better Health of California Inc., serves its 9,558 members in California. CVS Health is the designated parent corporation under the MA program for this contract. Contract H4982 received a 2027 Star Rating of 2.5.

aa. Contract H5302, entered into with CMS by Aetna Health Inc. (GA), serves its 44,367 members in Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H5302 received a 2027 Star Rating of 3.5.

bb. Contract H5325, entered into with CMS by Coventry Health Care of Kansas, Inc., serves its 18,894 members in Missouri and Arkansas. CVS Health is the designated parent corporation under the MA program for this contract. Contract H5325 received a 2027 Star Rating of 3.

cc. Contract H5521, entered into with CMS by Aetna Life Insurance Company, serves its 1,033,473 members in New York, Florida, North Carolina, Connecticut, Ohio, Michigan, South Carolina, Georgia, Massachusetts, California, Illinois, Wisconsin, Washington, New Jersey, Mississippi, Indiana, Colorado, Louisiana, Pennsylvania, Rhode Island, Alabama, Arizona, Nevada, Kentucky, Virginia, Tennessee, Oregon, Utah, Maryland, Delaware, Maine, New Hampshire, the District of Columbia, and Texas. CVS Health is the designated parent corporation

under the MA program for this contract. Contract H5521 received a 2027 Star Rating of 4.

dd. Contract H5522, entered into with CMS by Aetna Life Insurance Company, serves its 1,450,352 members in Pennsylvania, Illinois, New Jersey, Ohio, New York, Florida, Connecticut, Texas, California, Maryland, Virginia, Washington, North Carolina, Indiana, South Carolina, Georgia, Massachusetts, Michigan, Maine, Arizona, Missouri, Louisiana, West Virginia, Tennessee, Delaware, Colorado, Wisconsin, Alabama, Kentucky, Oklahoma, Nevada, Kansas, Oregon, New Hampshire, Minnesota, Utah, Arkansas, Iowa, Rhode Island, Idaho, New Mexico, Mississippi, Vermont, Hawaii, Montana, Alaska, Nebraska, Wyoming, the District of Columbia, South Dakota, North Dakota, the U.S. Virgin Islands, and Puerto Rico. CVS Health is the designated parent corporation under the MA program for this contract. Contract H5522 received a 2027 Star Rating of 4.5.

ee. Contract H5593, entered into with CMS by Aetna Health of Iowa Inc., serves its 4,019 members in Iowa. CVS Health is the designated parent corporation under the MA program for this contract. Contract H5593 received a 2027 Star Rating of 4.

ff. Contract H5793, entered into with CMS by Aetna Health Inc. (CT), serves its 62,230 members in Connecticut, Massachusetts, New Hampshire, Rhode Island, and Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H5793 received a 2027 Star Rating of 3.

gg. Contract H6303, entered into with CMS by Aetna Better Health Inc. (CT), will serve members in Connecticut effective January 1, 2027. CVS Health is the designated parent corporation under the MA program for this contract. Contract H6303 is considered a "new" contract for Star Rating purposes and therefore is entitled to receive the enterprise weighted average of all of CVS Health's contracts. CVS Health obtained an enterprise weighted average

Star Rating of 4. Contract H6303 therefore received a 2027 Star Rating of 4.

hh. Contract H6399, entered into with CMS by Aetna Better Health Inc. (NJ), serves its 7,334 members in New Jersey and Georgia. CVS Health is the designated parent corporation under the MA program for this contract. Contract H6399 received a 2027 Star Rating of 3.

ii. Contract H7149, entered into with CMS by Aetna Health Inc. (PA), serves its 9,609 members in Nebraska. CVS Health is the designated parent corporation under the MA program for this contract. Contract H7149 received a 2027 Star Rating of 4.

jj. Contract H7301, entered into with CMS by Coventry Health Care of Illinois, Inc., serves its 97,813 members in Illinois. CVS Health is the designated parent corporation under the MA program for this contract. Contract H7301 received a 2027 Star Rating of 4.

kk. Contract H8597, entered into with CMS by Aetna Better Health of Texas Inc., serves its 14,136 members in Texas. CVS Health is the designated parent corporation under the MA program for this contract. Contract H8597 received a 2027 Star Rating of 3.5.

ll. Contract H8649, entered into with CMS by Aetna Health of Utah Inc., serves its 1,446 members in Utah. CVS Health is the designated parent corporation under the MA program for this contract. Contract H8649 received a 2027 Star Rating of 3.5.

mm. Contract H9314, entered into with CMS by Aetna Better Health of Michigan Inc., serves its 17,145 members in Michigan and Indiana. CVS Health is the designated parent corporation under the MA program for this contract. Contract H9314 is considered a "new" contract for Star Rating purposes and therefore is entitled to receive the enterprise weighted average of all of CVS Health's contracts. CVS Health obtained an enterprise weighted average Star Rating of 4. Contract H9314 therefore received a 2027 Star Rating of 4.

nn. Contract H9431, entered into with CMS by First Health Life & Health Insurance

Company, serves its 681 members in North Dakota. CVS Health is the designated parent corporation under the MA program for this contract. Contract H9431 received a 2027 Star Rating of 2.5.

oo. Contract H9771, entered into with CMS by Aetna Better Health Premier Plan MMAI Inc., serves its 27,077 members in Illinois and Indiana. CVS Health is the designated parent corporation under the MA program for this contract. Contract H9771 is considered a "new" contract for Star Rating purposes and therefore is entitled to receive the enterprise weighted average of all of CVS Health's contracts. CVS Health obtained an enterprise weighted average Star Rating of 4. Contract H9771 therefore received a 2027 Star Rating of 4.

pp. Contract R6694, entered into with CMS by Aetna Life Insurance Company, serves its 915 members in New Jersey. CVS Health is the designated parent corporation under the MA program for this contract. Contract R6694 received a 2027 Star Rating of 4.

qq. Contract S5601, entered into with CMS by Silverscript Insurance Company, serves its 3,875,193 members in New York, California, Pennsylvania, Florida, Massachusetts, Ohio, Texas, South Carolina, Maryland, Connecticut, Illinois, Indiana, Virginia, New Jersey, North Carolina, Louisiana, Georgia, Kentucky, Minnesota, Michigan, Tennessee, Hawaii, Arizona, Missouri, Iowa, Washington, Wisconsin, Delaware, West Virginia, Oklahoma, Arkansas, Mississippi, Colorado, Oregon, Kansas, Idaho, Alabama, Nebraska, Nevada, New Hampshire, Utah, Montana, South Dakota, Vermont, Wyoming, New Mexico, North Dakota, Maine, Rhode Island, the District of Columbia, Alaska, Puerto Rico, the U.S. Virgin Islands, American Samoa, and Guam. CVS Health is the designated parent corporation for this contract. Contract S5601 received a 2027 Star Rating of 2.5.

20. Defendant HHS is a department of the Executive Branch of the United States

government charged with overseeing the Medicare program. Its headquarters are situated at 200 Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437-03 (June 5, 2001).

21. CMS is the HHS component agency primarily responsible for the administration and oversight of the Medicare program. *See id.* Its headquarters are situated at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

### I. Medicare Advantage

22. Medicare is a federal health insurance program established to serve Americans aged 65 and older, as well as qualifying individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.*

23. Medicare consists of four parts addressing distinct aspects of healthcare for its beneficiaries. Medicare Part A provides coverage for inpatient hospital stays, skilled nursing facilities, hospice care, and home health care. Medicare Part B provides coverage for outpatient care, physician visits, preventive services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395c through 1395i-6 (Part A); 42 U.S.C. §§ 1395j through 1395w-6 (Part B). Under Medicare Parts A and B—collectively referred to as "traditional" or "original" Medicare—the federal government serves as the insurer and directly reimburses providers for services rendered to enrolled beneficiaries.

24. As an alternative, a beneficiary may elect to enroll in Medicare Part C, known since 2003 as Medicare Advantage, in lieu of traditional Medicare. Congress established Medicare Part C through the Balanced Budget Act of 1997. *See* 42 U.S.C. § 1395w-21 *et seq.* Through the Medicare Advantage program, CMS contracts with private health insurers to furnish Medicare-covered benefits to enrolled beneficiaries, shifting the financial risk of benefit delivery away from

the federal government and onto privately operated MAOs, which receive a fixed monthly payment for each enrolled member. *See* 42 U.S.C. § 1395w-23. That per-member, per-month payment must equal or exceed traditional Medicare spending per member.

25. MAOs are required to furnish members with no less than the same level of benefits available under traditional Medicare. MAOs integrate coverage from both Parts A and B and frequently offer prescription drug coverage under Part D, which was enacted in 2003 and effective in 2006 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003). *See* 42 U.S.C. § 1395 *et seq.*

26. Among other programmatic reforms, the MMA established an annual bidding process. *See id.* § 1395w-23(a)(1)(B). Each year, MAOs submit a bid by the first Monday in June projecting the cost of delivering core Medicare benefits for the upcoming plan year, including overhead and profit. *See id.* If the bid falls below CMS's county-level benchmark, CMS refunds a portion of the savings to the MAO as a "rebate"—dollars the MAO may direct toward supplemental benefits, premium reductions, or both. *See id.* § 1395w-23(a)(1)(E).

## II. <u>Star Ratings and their impact on MAOs</u>

### A. Medicare Star Rating calculations

27. CMS began publishing annual performance ratings for stand-alone Medicare Prescription Drug Plans in 2007. In 2008, CMS "introduced and displayed the Star Ratings for Medicare Advantage Organizations . . . for both Part C only contracts . . . and Part C and D contracts (MA-PDs). Each year since 2008, [CMS has] released the MA Star Ratings [subsequently adding] [a]n overall rating combining health and drug plan measures" in 2011. 83 Fed. Reg. 16440, 16520 (April 16, 2018).

28. But even a decade before the launch of the Star Ratings program, MAOs were obligated to maintain "an ongoing quality assurance program" for the healthcare services furnished

to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)). Congress expressly conferred upon CMS the authority to select the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as components of plans' quality assurance programs. 42 U.S.C. § 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That discretion generated uncertainty and confusion, as CMS proposed various quality measures and practice standards without constraint.

29. In 2003, Congress eliminated this uncertainty by codifying CMS's quality measures into statute. *See* MMA, Pub. L. No. 108-173, § 109, 117 Stat. 2066 (2003). These amendments confined CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," permitting departure from those data types only upon submission of a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B).

30. In 2004, CMS recognized it was constrained under § 1395w-22(e), and that it would henceforth rely exclusively on its pre-existing, pre-2003 measurement systems addressing clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004) ("We interpret section 1852(e)(3)(B)(i) of the Act to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan.").

31. CMS inaugurated its Star Ratings system in 2007. In 2010, the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program and adopted the Star Ratings system as its implementing

mechanism. Congress identified § 1395w-22(e) as the sole source of data for quality rating calculations, omitting the clause that had previously afforded the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A).

32. Each contract's overall Star Rating is a composite score ranging from 1 to 5 stars, including half-stars, derived by evaluating the contract's performance on "measures" announced by CMS. Different measures carry different weight (assigned by CMS), and they combine to produce the contract's single summary rating. CMS publishes its Star Rating methodology in annual sub-regulatory guidance documents called "Technical Notes," which set forth the applicable measures and other key data used to assign measure-level scores. CMS revises these Technical Notes, and the measures they describe, outside of notice-and-comment rulemaking.

33. Because the overall Star Rating is a weighted average, performance on any single measure—particularly a heavily weighted one—can push a contract above or below a critical threshold. Contracts that reach the critical threshold score of 4.0 or better qualify for a QBP.

34. Thus, today, the Medicare "Star Ratings" program serves a dual purpose: it is CMS's main vehicle for evaluating and publicizing MAO care quality while also embodying the financial incentive structure Congress designed to encourage quality-driven competition among MAOs.

**B. Rebate retentions and the Quality Bonus Payment**

35. Under the MA program, MAOs submit bids to CMS in early June of the year preceding the contract year (*e.g.*, bids for MA contract year 2028 will be due to CMS in June 2027). MAOs that bid below the applicable benchmark receive a "rebate" from CMS, which they may deploy to enhance benefits, reduce cost-sharing, or lower premiums.

36. How much of that rebate an MAO keeps depends directly on its Star Rating.

Contracts rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount, while contracts achieving a rating of at least 3.5 but below 4.5 stars retain 65%. Contracts attaining the highest tier of 4.5 stars or above retain the maximum 70% of the rebate, thereby rewarding higher-quality contracts with greater financial flexibility. This tiered structure means that a contract's Star Rating carries significant downstream consequences not only for its QBPs but also for its capacity to improve access, affordability, quality, and health outcomes.

37. Pursuant to 42 U.S.C. § 1395w-23(o), CMS remits a QBP to MAOs whose contracts achieve a Star Rating of 4.0 or above. The QBP takes the form of an elevated benchmark—the maximum per-member amount CMS will pay—which in turn enables the MAO to offer enhanced supplemental benefits and return excess payments to members as rebates.

38. For a large MAO like CVS Health, lower Star Ratings, even by just half a star, can translate into billions of dollars in lost annual rebates and bonus payments and reduced member benefits.

**C. The Medicare Advantage cycle**

39. An MA contract's Star Rating for a given year dictates its rebate retention and QBP, if any, for the following contract year. Those anticipated rebates and QBP are factored into the bids MAOs submit to CMS the preceding June.

40. Relevant to this case, CMS released the 2027 Star Ratings for CVS Health's (and all other MAO) contracts on October 8, 2026. Those 2027 Star Ratings dictate CVS Health's rebate retentions and QBP for use in MA contract year 2028. The bids for the 2028 contracts are due to CMS in June 2027.

41. The following represents the typical schedule of key Medicare Star Ratings events:

| **2027 Star Ratings – Key Periods and Events** | |
|---|---|
| Calendar Year 2025 | Measurement period for the performance data that serve as a baseline for CVS Health's 2027 Star Ratings. |
| June 1, 2026 | Statutory bid deadline for 2027, factoring in anticipated 2027 rebate retentions and QBP based on 2026 Star Ratings |
| Aug. 5, 2026 – Aug. 12, 2026 | Plan Preview 1 for 2027 Star Ratings |
| Sept. 8, 2026 – Sept. 15, 2026 | Plan Preview 2 for 2027 Star Ratings |
| Oct. 8, 2026 | 2027 Star Ratings Published |
| Oct. 15, 2026 | Annual Election Period commences |
| Jan. 1, 2027 | Medicare Advantage Open Enrollment commences |
| June 7, 2027 | Statutory bid deadline for 2028, factoring in anticipated 2028 rebate retentions and QBP based on 2027 Star Ratings |
| 2028 | QBPs stemming from 2027 Star Ratings paid |

## III. <u>CVS Health's 2027 Star Ratings</u>

### A. Publication of 2027 Star Ratings in October 2026

42. On October 8, 2026, CMS published the 2027 Star Ratings. With respect to CVS Health, CMS assigned overall 2027 Star Ratings of 3 stars to Contract H0523, 3.5 stars to Contract H0628, 4 stars to Contract H1109, 3.5 stars to Contract H1206, 4 stars to Contract H1608, 4 stars to Contract H1609, 3.5 stars to Contract H1692, 3 stars to Contract H2056, 3.5 stars to Contract H2293, 3.5 stars to Contract H2663, 3.5 stars to Contract H3146, 4 stars to Contract H3152, 3.5 stars to Contract H3192, 3.5 stars to Contract H3219, 3.5 stars to Contract H3239, 3.5 stars to Contract H3288, 3 stars to Contract H3312, 4 stars to Contract H3597, 3.5 stars to Contract H3748, 3.5 stars to Contract H3928, 3.5 stars to Contract H3931, 3.5 stars to Contract H3959, 3 stars to

Contract H4523, 3 stars to Contract H4711, 3 stars to Contract H4835, 2.5 stars to Contract H4982, 3.5 stars to Contract H5302, 3 stars to Contract H5325, 4 stars to Contract H5521, 4.5 stars to Contract H5522, 4 stars to Contract H5593, 3 stars to Contract H5793, 4 stars to Contract H6303, 3 stars to Contract H6399, 4 stars to Contract H7149, 4 stars to Contract H7301, 3.5 stars to Contract H8597, 3.5 stars to Contract H8649, 4 stars to Contract H9314, 2.5 stars to Contract H9431, 4 stars to Contract H9771, 4 stars to Contract R6694, and 2.5 stars to Contract S5601.

43. Each of those ratings would have been at least 0.5 stars higher, had it not been calculated using measures that exceeded CMS's statutory authority or measures that were adopted without the notice-and-comment rulemaking required by law.

44. CMS also published CVS Health's measure-level Star Ratings on its website, rendering both the overall and measure-specific ratings visible to Medicare beneficiaries, brokers, and the general public through the Plan Finder tool.

45. In publishing these Star Ratings, CMS relied on 28 measures that were unlawful for the same reasons previously considered and disposed of by this Court.

46. On November 7, 2025, Clover Insurance Company filed suit in this Court challenging its *2026* Star Rating on the ground that CMS had unlawfully adopted certain measures used in its calculation.

47. In an order entered on May 27, 2026, this Court agreed with respect to 20 measures on which CMS relied in calculating the 2026 Star Ratings. Specifically, the *Clover* Court held that the Medicare statute (42 U.S.C. § 1395w-23(o)(4)(A)) prohibits CMS from incorporating Star Ratings measures derived from data collected outside § 1395w-22(e). *Clover Ins. Co.*, 2026 WL 1483515, at *14. The Court additionally held that CMS's utilization of measures established or materially changed without sufficient notice-and-comment contravened 42 U.S.C. § 1395hh(a)(2).

*Id*. at *25.

48. The following chart identifies the measures this Court found in *Clover* were *unlawful*, along with the bases for this Court's decision:

| | |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • **C32** (Reviewing Appeals Decisions);<br>• **C33** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of a Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (MTM Program Completion Rate for CMR); and<br>• **D12** (Statin Use in Persons with Diabetes). |
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C15** (Reducing the Risk of Falling);<br>• **C16** (Improving Bladder Control);<br>• **C22** (Getting Needed Care);<br>• **C23** (Getting Appointments and Care Quickly);<br>• **C24** (Customer Service);<br>• **C25** (Rating of Health Care Quality); and<br>• **C27** (Care Coordination). |

49. CVS Health faces injury from a different combination of measures, which are unlawful for the same reasons articulated by the Court in *Clover*. Specifically, all of the measures CVS Health challenges are defective because they were not promulgated through notice-and-comment rulemaking:

| | |
|---|---|
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C06** (Monitoring Physical Activity);<br>• **C07** (Special Needs Plan (SNP) Care Management);<br>• **C10** (Osteoporosis Management in Women who had a Fracture); |

| | |
|---|---|
| | • **C11** (Diabetes Care – Eye Exam);<br>• **C13** (Kidney Health Evaluation for Patients with Diabetes);<br>• **C15** (Reducing the Risk of Falling);<br>• **C16** (Improving Bladder Control);<br>• **C18** (Statin Therapy for Patients with Cardiovascular Disease);<br>• **C19** (Transitions of Care (Part C) – Average);<br>• **C20** (Follow-up after Emergency Department Visit for People with Multiple High-Risk Chronic Conditions);<br>• **C21** (Getting Needed Care);<br>• **C22** (Getting Appointments and Care Quickly);<br>• **C25** (Rating of Health Plan);<br>• **C26** (Care Coordination);<br>• **C28** (Members Choosing to Leave the Plan (Part C));<br>• **C29** (Health Plan Quality Improvement);<br>• **D03** (Members Choosing to Leave the Plan (Part D));<br>• **D04** (Drug Plan Quality Improvement);<br>• **D05** (Rating of a Drug Plan);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (Statin Use in Persons with Diabetes);<br>• **D12** (Concurrent Use of Opioids and Benzodiazepines); and<br>• **D13** (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults). |

50. Furthermore, 12 of these measures are unlawful for the additional reason that they fail to comply with the requirement at 42 U.S.C. § 1395w-23(o)(4)(A) that data must be "collected under section 1395w-22(e)":

| | |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • **C07** (Special Needs Plan (SNP) Care Management);<br>• **C28** (Members Choosing to Leave the Plan (Part C));<br>• **C29** (Health Plan Quality Improvement);<br>• **D03** (Members Choosing to Leave the Plan (Part D));<br>• **D04** (Drug Plan Quality Improvement);<br>• **D05** (Rating of a Drug Plan);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (Statin Use in Persons with Diabetes);<br>• **D12** (Concurrent Use of Opioids and Benzodiazepines); and |

| | |
|---|---|
| | • **D13** (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults). |

51. In *Clover*, this Court vacated Clover's 2026 Star Rating and directed CMS to recalculate it consistent with this Court's decision.

52. CMS did not immediately appeal that decision and seek a stay. CMS complied with it by recalculating Clover's 2026 Star Rating.

53. Fifty-five days after the decision, on July 21, 2026, Defendants filed a notice of appeal to the United States Court of Appeals for the Eleventh Circuit. *See Clover Ins. Co. v. HHS*, No. 2:25-cv-00142 (S.D. Ga.), Notice of Appeal, ECF No. 67 (July 21, 2026). At CMS's request, the court of appeals expedited the briefing in that appeal and has tentatively scheduled argument for mid-January. *See Clover Ins. Co. v. HHS*, No. 26-12553 (11th Cir.), ECF No. 19. CMS has requested a decision by spring 2027. *See Clover Ins. Co. v. HHS*, No. 26-12553 (11th Cir.), Mot. to Restart or Set Briefing Schedule and to Expedite Oral Argument, ECF No. 13 (Aug. 19, 2026). All the same, as of the filing of this Complaint, the *Clover* order stands as a binding order of this Court as to Clover's 2026 Star Ratings.

54. CMS's legal authority with respect to the Star Rating program has not been broadened by Congress in the past year; there has been no change that makes CMS's reliance on those same measures held unlawful in *Clover* any less unlawful for purposes of calculating the 2027 Star Ratings.

55. What is more, CMS voluntarily excluded the equivalent set of measures from its calculation of Clover's 2027 Star Rating. This, despite the Court's judgment in *Clover* being limited to Clover's 2026 Star Rating. *No other MA plan received this same beneficial treatment*. And yet, the 28 measures challenged in this lawsuit are unlawful on the same grounds as those

articulated by the Court in *Clover*. By voluntarily excluding an equivalent set of measures from Clover's 2027 Star Rating, CMS is implicitly conceding the legal infirmities identified by this Court.

### B. Adopting measures without notice and comment undermines the very point of the Star Ratings program.

56. The requirement that CMS proceed through notice-and-comment rulemaking before applying Medicare quality measures reflects deliberate legislative judgment and takes into account the high financial stakes of the Star Ratings program. Even a modest shift of one half-star in a plan's overall rating can alter payments to that plan. It was against this backdrop that Congress adopted 42 U.S.C. § 1395hh(a)(2), mandating that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" under Medicare must not take effect without promulgation by notice and comment. The Supreme Court has held that the Medicare statute imposes a more stringent notice-and-comment requirement than the APA. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (affirming the lower court's order vacating a Medicare reimbursement policy that was adopted without notice and comment as required by § 1395hh(a)(2)).

57. As originally conceived, the Star Ratings framework was intended to rest on a discrete set of clinically grounded quality measures, refined through public participation and regulatory transparency, so that Medicare beneficiaries could compare plans on a reliable and consistent basis and so that CMS could be held accountable for the measures it creates and employs. That objective has been undermined by CMS's practice of issuing dense, annually revised "Technical Notes" that effectively rewrite the operative measure specifications each year without formal rulemaking. MedPAC, the independent congressional advisory body charged with

analyzing Medicare policy, concluded that "the current system for MA quality measurement and reporting is flawed and does not provide a reliable basis for evaluating quality across MA plans." MedPAC, Report to the Congress: Medicare and the Health Care Delivery System 321 (June 2025). MedPAC most recently characterized the MA quality system as failing to produce "meaningful information on plan quality for Medicare Beneficiaries or the Medicare program." MedPAC, Report to the Congress: Medicare and the Health Care Delivery System 31 (June 2026). The measures that CMS used to calculate CVS Health's 2027 Star Ratings function as substantive legal standards with a direct effect on the payments that the statute obligates CMS to make, yet CMS never subjected those measures to the rulemaking process that the law demands.

58. The Star Ratings program illustrates the hazards of regulating by sub-regulatory fiat. CMS uses measures that carry significant reputational and financial importance for MAOs without giving notice and affording an opportunity for stakeholder comment to give meaningful and informed feedback so that CMS's measures properly reflect performance, as the Star Rating program was intended to accomplish.

59. As is, many of CMS's chosen measures undermine the legitimacy and stability of an objective and fair ratings system.

60. For example, C28 (Members Choosing to Leave the Plan (Part C)) and D03 (Members Choosing to Leave the Plan (Part D)) evaluate outcomes that are ultimately determined by independent beneficiary behavior that is divorced from anything the MAO itself does or fails to do. Disenrollment measures treat member shopping behavior as though it were a reliable signal of plan quality, yet it is often driven by premium changes, competitor marketing, broker recommendations, and geographic relocation. In each case, the measure conflates beneficiary autonomy with plan performance, rewarding or penalizing MAOs for decisions they cannot

control.

61. Scores for other measures such as C21 (Getting Needed Care) and C22 (Getting Appointments and Care Quickly) are substantially driven by market-level conditions, including provider workforce supply, geographic distribution of specialists, appointment capacity, and regional demand. These are conditions that affect all plans operating in a given area, which no single MAO can meaningfully alter. A plan may maintain a strong network and still receive low scoring on measures C21 or C22 because the underlying supply of physicians or other specialists in its service area is insufficient to meet demand. External events such as provider retirements, labor shortages, and regional demand spikes can materially depress scores even when the plan's own network-management and access-improvement efforts are exemplary. These measures therefore function less as assessments of plan quality and more as reflections of the healthcare infrastructure in the markets where plans happen to operate, penalizing organizations for systemic resource constraints that lie beyond their authority to remedy.

62. Measures C25 (Rating of Health Plan), C26 (Care Coordination), and D05 (Rating of a Drug Plan) capture global member impressions rather than discrete, verifiable quality outcomes. These ratings may be influenced by factors that do not measure the MAO's performance, including a beneficiary's underlying health status, expectations and prior experiences with the health care system, experiences with physicians and hospitals, geographic differences in provider availability and local health care infrastructure, socioeconomic circumstances, and individual differences in how beneficiaries interpret and respond to survey questions. As a result, these measures cannot reliably distinguish the MAO's performance from other influences on a beneficiary's perception and may therefore reflect general sentiment rather than an identifiable quality outcome attributable to the MAO.

63. HOS measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C06 (Monitoring Physical Activity), C15 (Reducing the Risk of Falling), and C16 (Improving Bladder Control) suffer from various methodological weaknesses that make them uniquely ill-suited for a high-stakes payment program. They are generated from a relatively small sample of beneficiaries and then extrapolated to represent entire plan populations that may include hundreds of thousands of members, meaning a handful of respondents can materially swing contract-level scores. The data is collected over an extended period and often reflect member health status from years earlier; by the time results are incorporated into Star Ratings, plans may have already implemented major clinical and operational improvements, rendering the scores a retrospective snapshot of historical conditions rather than a measure of current quality. The outcomes themselves are driven by aging, chronic-disease progression, genetics, socioeconomic factors, and personal behavior, all of which lie largely outside the MAO's control. Members self-report these outcomes, and two members with identical clinical conditions may report dramatically different results depending on individual circumstance. HOS was originally designed as a population-health survey tool, not as a primary determinant of billions of dollars in QBPs, and its use in Star Ratings creates substantial statistical uncertainty with disproportionate financial consequences.

64. The three medication adherence measures, Medication Adherence for Diabetes Medications (D08), Medication Adherence for Hypertension (RAS Antagonists) (D09), and Medication Adherence for Cholesterol (Statins) (D10), do not reliably measure the quality of care furnished by an MAO. They primarily measure whether prescription fills are captured in Part D claims at intervals sufficient to satisfy CMS's claims-based specifications. But the absence of a Part D claim does not establish that a beneficiary failed to obtain or take the medication.

Beneficiaries may fill prescriptions through cash programs, Veterans Affairs benefits, other coverage, or pharmacies that process the transaction outside the plan benefit. In those circumstances, the measure may classify a beneficiary as nonadherent even though the beneficiary obtained the medication. The result can therefore turn on where and how the prescription was processed, making the measure partly an administrative exercise in capturing pharmacy records rather than a reliable assessment of adherence or plan quality. The measures also fail to account for clinical judgment. Physicians may modify, substitute, or discontinue therapy because of adverse effects, contraindications, drug interactions, changes in clinical status, or patient-centered decision-making. Pharmacy claims neither establish that a filled medication was consumed nor reliably distinguish nonadherence from clinically appropriate treatment changes. For these reasons, the measures substitute the administrative visibility of pharmacy transactions for clinical appropriateness and outcomes. They may penalize plans and classify beneficiaries as nonadherent based on the site or method of prescription processing rather than the quality of care furnished.

65. Finally, Quality Improvement ("QI") measures C29 (Health Plan Quality Improvement) and D04 (Drug Plan Quality Improvement) are not independent assessments of beneficiary outcomes, patient experience, access, safety, or clinical quality; they are derivative calculations that measure year-over-year movement in other measures already scored within the Star Ratings framework, effectively double-counting performance while adding limited independent information. As the base of underlying measures shrinks, improvement scores become increasingly sensitive to movement in a small number of individual measures; a single measure can disproportionately affect the overall QI result, creating volatility that may not reflect any meaningful change in actual quality. Despite this growing instability, the QI measures continue to receive a 5x weight in the Star Ratings methodology, amplifying the impact of an increasingly

unreliable calculation on overall Star Ratings and the billions of dollars in QBPs that flow from them. The QI framework was developed when a broader and more statistically robust set of measures existed; with many measures now removed, invalidated, or legally challenged, continuing to assign outsized weight to these derivative scores risks distorting the entire ratings system while providing little genuine insight into plan quality or beneficiary outcomes.

66. CMS implemented all of these measures without providing MAOs a meaningful opportunity to provide feedback.

67. Had CMS opened these measures to the notice-and-comment process that the statute demands, plans, clinicians, patient advocates, and other stakeholders would have had the opportunity to identify the methodological deficiencies described above and to propose alternative specifications better calibrated to actual plan quality before CMS finalized and applied its flawed measures. As the D.C. Circuit has observed: "Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). And the Supreme Court affirmed in *Allina* that the Medicare statute sweeps even more broadly than the APA. 587 U.S. at 579. And yet, CMS bypassed the principal safeguard established by Congress to ensure that Star Ratings measures are grounded in sound methodology and informed by the practical expertise of stakeholders, instead designing and self-approving flawed metrics that have inflicted substantial financial and reputational harm on MAOs and their plans.

**C. The impact of the unlawful 28 measures on CVS Health's MA contracts**

68. Exhibit A to this Complaint presents a chart demonstrating how the 2027 Star

Ratings for each of the contracts would change if those ratings were recalculated, either directly by excluding the 28 measures challenged in this lawsuit, or indirectly as determined by a recalculated enterprise average rating. As Exhibit A illustrates, absent the 28 unlawful measures, CVS Health projects that the contracts at issue would have received higher overall 2027 Star Ratings of at least 0.5 greater.

69. As the designated parent corporation (as that term is defined in 42 C.F.R. 422.2) of the contracts listed in Exhibit A, CVS Health has a calculated enterprise weighted average Star Rating of all its contracts that gets applied to contracts that are considered "new" contracts under 42 C.F.R. § 422.166(d)(2)(vi). Based upon CMS's calculation of CVS Health's various contracts, the enterprise weighted average of its contracts is 4 Stars. However, had CMS calculated the contracts listed in Exhibit A by excluding the 28 unlawful measures, CVS Health's enterprise weighted average would be 4.5 Stars. That correct enterprise weighted average would then be applied to contracts H6303, H9314, and H9771, as they are "new" contracts that receive the enterprise weighted average rating for purposes of determining rebate retention and QBPs.

70. The financial consequence of CMS's action is enormous, amounting to more than $2 billion in lower or lost rebates and QBPs that will be realized over the course of 2028. These are resources that allow MAOs like CVS Health to invest in supplemental benefits, premium reductions, and quality improvement activities for its members.

**D. Reputational harm caused by the publication of unlawfully derived Star Ratings**

71. Further, CMS's publication of Star Ratings distorted by its inclusion of 28 unlawful measures has caused, and continues to cause, significant reputational harm to CVS Health. Star Ratings are publicly disclosed on CMS's Medicare Plan Finder tool, where current and prospective Medicare beneficiaries routinely consult them when making enrollment decisions. A depressed

Star Rating (particularly one that falls below the 4.0-Star threshold) signals to the market that an MAO's quality of care is substandard, regardless of whether that rating accurately reflects the MAO's actual performance. At the same time, because Star Ratings are relative, peer MAO ratings have been artificially inflated by differing CMS calculations, further distorting how the CVS Health plans are perceived and casting them in poorer light.

72. The reputational consequences of a below-threshold Star Rating extend beyond the individual enrollment cycle. Brokers and third-party marketing organizations that direct Medicare beneficiaries toward specific plans may deprioritize or decline to market plans rated below 4.0 stars, reducing CVS Health's visibility and competitiveness in the marketplace. Employers and plan sponsors that offer Medicare Advantage options to retirees may similarly rely on Star Ratings as a proxy for plan quality, and a suppressed rating diminishes CVS Health's ability to compete for and retain those relationships.

## CLAIMS FOR RELIEF

### COUNT I: AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW (5 U.S.C. § 706(2)(D))

73. Plaintiffs incorporate by reference paragraphs 1-72 above as though fully set forth herein.

74. Under 5 U.S.C. § 706(2)(D), an agency may not act without observance of procedure required by law.

75. Congress has mandated that CMS engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits

under [Medicare].” *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

76. Moreover, by its own regulation, CMS is obligated to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) (“In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking.”). *See also id.* § 422.164(d) (requiring notice-and-comment rulemaking for substantive updates to existing measures); *id.* § 423.184(c), (d) (requiring same for Part D measures).

77. CMS did not undertake the required notice-and-comment rulemaking and codify “by regulation” the following measures applied to CVS Health in calculating its 2027 Star Ratings: C03, C04, C05, C06, C07, C10, C11, C13, C15, C16, C18, C19, C20, C21, C22, C25, C26, C28, C29, D03, D04, D05, D08, D09, D10, D11, D12, and D13. Each of these measures establishes a substantive legal standard governing CVS Health’s QBP eligibility—and therefore governing “the payment for services” within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none were promulgated by regulation.

78. Because CMS derived the 2027 Star Rating for the contracts identified in Exhibit A from measures adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should vacate each of CVS Health’s unlawful 2027 Star Ratings for those contracts and direct CMS to recalculate those Star Ratings without regard to these measures.

**COUNT II: AGENCY ACTION NOT IN ACCORDANCE WITH LAW,
IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY
AUTHORITY
(5 U.S.C. § 706(2)(A), (C))**

79. Plaintiffs incorporate by reference paragraphs 1-72 above as though fully set forth herein.

80. Congress restricted the data upon which CMS's Star Ratings may be based to data for which an MAO provides for the collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

81. Twelve of the measures challenged here that CMS applied in calculating CVS Health's 2027 Star Ratings for the contracts identified in Exhibit A relied on data not collected under § 1395w-22(e): C07, C28, C29, D03, D04, D05, D08, D09, D10, D11, D12, and D13.

82. Because CMS calculated CVS Health's 2027 Star Ratings for the contracts identified in Exhibit A from data not collected under § 1395w-22(e), the Court should vacate the unlawful 2027 Star Ratings for those contracts and direct CMS to recalculate those Star Ratings without regard to these measures.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

a) Declare that CMS's inclusion of measures C03, C04, C05, C06, C07, C10, C11, C13, C15, C16, C18, C19, C20, C21, C22, C25, C26, C28, C29, D03, D04, D05, D08, D09, D10, D11, D12, and D13 in calculating CVS Health's 2027 Star Ratings was without observance of procedure required by law because CMS failed to adopt those measures through public notice and comment, as mandated by 42 U.S.C. § 1395hh(a)(2) and 42 C.F.R. §§ 422.164 and 423.184;

b) Declare that CMS's inclusion of measures C07, C28, C29, D03, D04, D05, D08, D09, D10, D11, D12, and D13 in calculating the 2027 Star Ratings for the contracts identified in Exhibit A was unlawful for the additional reason that it exceeded CMS's statutory authority

because those measures were not derived from data authorized by 42 U.S.C. § 1395w-23(o)(4)(A);

c) Vacate the 2027 Star Ratings of the contracts identified in Exhibit A and remand to CMS with instructions to recalculate for each contract at issue the overall 2027 Star Rating excluding the 28 unlawful measures identified in this Complaint;

d) Direct CMS to determine all 2028 CVS Health QBPs and rebates consistent with the recalculated Star Ratings;

e) Declare that CVS Health's enterprise weighted average rating would be 4.5 Stars and that such rating would be the applicable Star Rating for purposes of determining the rebate retention and QBPs for contracts H6303, H9314, and H9771;

f) Order CMS to permit Plaintiffs to revise any previously submitted MA bid(s) necessary to effectuate the judgment, consistent with this Court's order, the recalculated Star Ratings, and the revised QBPs and rebates; and

g) Award Plaintiffs such other and further relief as the Court may deem just and proper, including costs and fees, as permitted by law.

*[Signature Page Follows]*

Dated: October 26, 2026

*/s/ T. Joshua R. Archer*
Benjamin H. Brewton
Georgia Bar No. 002530
bbrewton@balch.com
Jena C. Lombard
Georgia Bar No. 213734
jlombard@balch.com
**Balch & Bingham LLP**
801 Broad Street, Suite 800
Augusta, Georgia 30901
Telephone: (706) 842-3711
Facsimile: (866) 258-8984

T. Joshua R. Archer
Georgia Bar No. 021208
jarcher@balch.com
James L. Hollis
Georgia Bar No. 930998
jhollis@balch.com
**Balch & Bingham, LLP**
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 962-3585
Facsimile: (866) 332-8969

Daniel W. Wolff (*pro hac vice* forthcoming)
DWolff@crowell.com
D.C. Bar No. 486733
Michael W. Lieberman (*pro hac vice* forthcoming)
MLieberman@crowell.com
D.C. Bar No. 988835
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615

*Counsel for Plaintiffs*